[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10927
_____

D.C. Docket No. 6:14-cr-146-ACC-TBS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KEENAN AUBREY DAVIS,
KELSEY VIDEL COFFEE,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(November 22, 2016)

Before MARTIN and JORDAN, Circuit Judges, and VINSON,* District Judge.

VINSON, District Judge:

_____

* Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

The verdict form is one of the most important parts of a criminal jury trial, but it often receives the least attention.  This is a case in point.

The defendants here were charged (and found guilty of several counts) in an eight-count superseding indictment.  The verdict forms that were given to the jury mistakenly listed one of the counts as "robbery" instead of "using a firearm during and in relation to [a robbery]."  Everyone missed the error---the defendants and the government (who jointly submitted the verdict forms), the district court judge, and court personnel---and the error was later transposed onto the defendants' written judgments, where it was not discovered until more than five months after the trial.  When the district court learned of the error, it gave the parties notice and amended the judgments under Rule 36 of the Federal Rules of Criminal Procedure, which provides in full: "After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment, order, or other part of the record, or correct an error in the record arising from oversight or omission."  The defendants argue on appeal that the amendment was improper and that the original (erroneous) judgments should be reinstated, consistent with what the jurors found.[1]  After close review and oral argument, we conclude that the district court properly amended the judgments and we affirm.

I.

---

[1] The defendants have raised additional arguments as well, including sufficiency of the evidence and sentencing challenges.  We find that those other arguments lack merit and do not require extended discussion.  *See* note 9 *infra*.  The error with the verdict forms and judgments presents the only real issue on appeal.

Between May and September 2013, there was a string of six retail robberies in and near Orange County, Florida. The robbers wore gloves and hid their faces behind masks. Eventually, Keenan Davis was arrested and charged with all six robberies, while his friend Kelsey Coffee was charged in connection with five of the six. These robberies were carried out with help from numerous accomplices, including, among others, Tiandre Rogers, Moses Patterson, Danoris Scott, and Jamal Tillman, each of whom pled guilty and (except for Tillman) agreed to testify for the government. Davis and Coffee opted to go to trial, where the evidence against them (viewed in the light most favorable to the government) showed the following with respect to the six robberies.

(1) On the morning of May 10, 2013, Davis, Rogers, Patterson, and Scott robbed the manager of Rack Room Shoes at an outlet mall in Orlando as she left the store with a bank deposit. The robbery was Patterson's idea as he worked at the store and knew when the manager left for the bank. Patterson waited outside and alerted the others when she exited the store, at which point Davis and Scott sprayed her with mace and grabbed the deposit, while Rogers drove the getaway car. No firearm was used during this first robbery, and there is no evidence that Coffee was involved.

(2) On May 26, 2013, Davis (carrying a shotgun) and Patterson (carrying an "airsoft" gun that looked like a real pistol[2]) robbed a Levi's store just a few doors

---

[2] "Airsoft guns are replicas of firearms; they usually have the same color, dimensions, weight and markings as real firearms." *Gibbs v. Lomas*, 755 F.3d 529, 534 (7th Cir. 2014).

3

down from the Rack Room Shoes.  Scott served as lookout and Rogers drove the getaway car.  It was the government's theory that this second robbery was carried out with "inside help" from Coffee, who worked at the store and was friends with Davis, Patterson, Scott, Rogers, and Tillman.  After the robbery, Davis, Patterson, Scott, and Rogers met at a hotel room to divide the $36,000 that they stole.  Davis and Patterson took pictures of themselves posing with the money.[3]

(3) Early in the morning on July 30, 2013, Coffee, Davis, Patterson, and Rogers robbed an Oshkosh b'Gosh store at the outlet mall.  Coffee carried the shotgun and Patterson carried the airsoft gun.  They removed a 300-pound safe from the store, which they later discovered contained only about $2,000 in cash, gift cards, and a couple of iPads.

(4) On August 5, 2013, Coffee, Davis, and Patterson robbed a McDonald's in Apopka, Florida.  Once again, Coffee carried the shotgun and Patterson carried the airsoft gun.  They tied up all the employees with "zipties" and took what they could from the safe, which was only about $700.

(5) In early August 2013, Davis exchanged a series of text messages with Cavoniss Lewis, a friend who worked at a Sweetbay Market grocery store.  Davis tried to convince Lewis to help them rob the store, and he assured her in one of his texts that "we have all the answers and tools to perform the job perfectly," but she refused to participate.  Thereafter, on August 20, 2013, Davis, Coffee, Patterson, and

---

[3] As will be seen, Coffee was acquitted of the charges stemming from the Levi's robbery, but Davis was convicted.

4

Scott robbed the Sweetbay Market without Lewis's help. The group used the shotgun and airsoft pistol for this robbery, which was confirmed by three employees who testified at the trial and video from the store's surveillance camera that was played to the jury. When Lewis learned of the robbery afterward, she felt uncomfortable and thought that she should say something. She contacted the store's human resources department, which, in turn, contacted the police. Lewis subsequently gave the police access to her phone and previous text messages with Davis.

(6) Finally, on September 7, 2013, Coffee, Davis, and Patterson (with help from Rogers, Scott, Tillman and others) robbed a Nike outlet at a mall in Ellenton, Florida. The group drove to the outlet mall in two separate cars and, upon arrival, they split up. Coffee walked past the Nike store to survey the area; Davis sat at a nearby table to get prepared; and Patterson walked through the parking lot toward the store with a dust broom, dust pan, and black plastic trash bag in order to avoid suspicion. Unbeknownst to them, they were under police surveillance at the time. While Patterson was on his way to the Nike store, one of the undercover officers on the surveillance team saw him walk right in front of the officer's car, sit down on the curb, put on gloves, and start to pull a mask or "something" over his face.[4] The officer also noticed that Patterson was carrying what appeared to be a shotgun inside the plastic trash bag. Patterson saw the undercover officer watching him and got

---

[4] This officer, Detective Joseph Petta with the Manatee County Sheriff's Office, did not know for sure at the time (or at trial) who the person was. However, Patterson's trial testimony makes clear that he was the person Detective Petta saw.

5

worried that "something was up," so he went back to his car and put the dust broom, dust pan, and trash bag inside the trunk and, in his words, "replaced" the shotgun. At or around this point, there was a delay as the group began to have a disagreement about whether they should go forward with the robbery. Because there were so many people at the outlet mall and in the parking lot, some members of the group began to think it was a "bad idea" and wanted to back out.[5] Davis and Coffee insisted on moving forward with the plan, however, and eventually the two men entered the Nike store armed with only the airsoft pistol. They tied up all the employees with zipties and emptied the safe of approximately $15,000. As they left, the police and members of the SWAT team converged on the scene. Tillman was arrested in front of the Nike store; Davis and Coffee were arrested after trying to flee on foot; and Patterson was arrested while attempting to drive the getaway car with Rogers and Scott. The shotgun was found in the trunk of the getaway car, along with a loaded Taurus handgun on the floorboard.

The defendants were charged in a multi-count indictment. Counts 1, 2, 4, 5, 6, and 8 charged robbery in violation of 18 U.S.C. § 1951(a) (for the Rack Room Shoes,

---

[5] Davis's attorney referenced certain of this evidence during her closing argument, when she told the jury that:

> [Patterson] had that shotgun in a plastic bag . . . fixing to mask up when [he saw Detective Petta and said] oh, hold up. Don't---let's not attack---let's not do the take down. And they waited and it was 30 minutes while [Patterson] went back to the car and put it in the trunk. * * * Detective Petta saw [Patterson] walking back and forth with a shotgun in the bag.

Levi's, Oshkosh b'Gosh, McDonald's, Sweetbay Market, and Nike store robberies, respectively), while Counts 3 and 7 charged the possession and use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (for the Levi's and Sweetbay Market robberies, respectively).[6] As previously indicated, all of the other co-defendants pled guilty and several agreed to testify for the government. Davis and Coffee elected to go to trial, and their defense was that the others were lying and had falsely accused them in order to get sentence reductions.

Throughout the trial, the jury was repeatedly told that there were *two* groups of offenses. For example, the district court judge read the superseding indictment to the jury pool during *voir dire*, which clearly delineated the robbery and firearm offenses. Similarly, the government told the jury during its opening statement that the defendants were both charged with several counts of robbery and "two counts of using a firearm, brandishing a firearm in relation to or in furtherance of those robberies." Counsel for Coffee likewise told the jury during opening statement that there were several counts, that the government had correctly "summarized" those counts, and that careful attention should be paid to each one as "[t]here are some charges of robbery of separate stores and there are some charges relating to the possession of firearms."

The closing arguments to the jury similarly highlighted that the two firearm offenses in Counts 3 and 7 were separate and distinct from the robbery charges. For

---

[6] Davis was charged in all eight counts. Coffee was charged in every count except Count 1 (Rack Room Shoes) since there was no evidence that he played any role in that first robbery.

7

example, after discussing the robberies themselves, the government told the jury about

"the two other crimes:"

> [I]t's a separate federal crime for anyone to use a firearm in
> relation to or carry a firearm during and in relation to or
> possess a firearm in furtherance of a crime of violence.
> The elements you have to show there, the defendant
> committed a violent crime as charged in counts 3 and 7.
> There's two counts of using the firearm.

The government further told the jurors that for those two counts they had to find, *inter*

*alia*, that a firearm was used during and in relation to the robberies that were charged

in Counts 2 and 6, namely, the Levi's and Sweetbay Market robberies: "You have

seen the videos of the Sweetbay robbery.  The robbery progressed and everybody

knew shotguns were going to be used from Levi's to Sweetbay.  Each of the

defendants actively participated in the violent crimes charged in Levi's and Sweetbay

for the firearm counts."

Coffee's attorney noted the differences between the two groups of offenses

during his closing argument as well:

> So you will see several instances referred to as 1951.  That
> would be the robbery of Levi's, Oshkosh, McDonald's,
> Sweetbay, and Nike.  All of those events are reflected in
> the verdict format as 1951.
>
> There are also two charges in the indictment and two
> spaces on the verdict form.  This would be count three that
> relates to Levi's and count seven.  Those are completely
> different criminal offenses.  They have different elements.
> They require different kinds of proof, and they are distinct
> and separate. . . .

8

> So I'm going to ask you to pay close attention as you review the verdict form, match it up with the indictment and consider the evidence as it relates to each offense and each element of each offense and see if indeed the government has met its burden of proof, in fact, the highest burden that exists in law.

Coffee's counsel then proceeded to further discuss the "six [robbery] counts that are effectively the same," after which he told the jurors what was required for the two firearm offenses "in counts three and seven."

At the end of closing arguments, the district court instructed the jury on the law to be applied and the elements that had to be proven, and it is undisputed that those instructions were correct. After setting forth the elements for the robbery counts, the district court instructed the jury that: "It's a separate federal crime for anyone to use a firearm in relation to or carry a firearm during and in relation to or possess a firearm in furtherance of a crime of violence." The district court gave lengthy instructions for the two firearm charges "in counts three and seven"---and told the jury that those charges related to the robberies "charged in counts two and six of the indictment, respectively"---and each juror was given a written copy of the instructions, along with at least one copy of the superseding indictment. The district court also sent back two verdict forms (one for each defendant) that Davis, Coffee, and the government had jointly submitted. However, both verdict forms contained an error with one of the two firearm counts. Specifically, while Count 3 was correct, the verdicts mistakenly identified Count 7 as charging the defendants with "robbery, in violation of 18 U.S.C.

9

§ 924(c)(1)(A)." In other words, Count 7 was incorrectly *named*, but the *statutory citation* was accurate. The verdict forms for the firearm offenses charged in Counts 3 and 7 thus read (emphasis added):

### Count Three of the Indictment

As to the offense of *using a firearm during and in relation to a crime of violence*, in violation of 18 U.S.C. § 924(c)(1)(A),

We, the Jury, find the defendant [Davis/Coffee]:

Not Guilty _____    Guilty _____

### Count Seven of the Indictment

As to the offense of *robbery*, in violation of 18 U.S.C. § 924(c)(1)(A),

We, the Jury, find the defendant [Davis/Coffee]:

Not Guilty _____    Guilty _____

At the charging conference, the attorneys had been asked if they had objections to the verdict form as written, and they all said "no objection." Neither the parties nor the district court noticed the error with Count 7 on the verdict forms before or while the jurors deliberated. During deliberations, the jurors asked the following question: "[Does] the offense of using a firearm which would violate 18 U.S.C. § 924 require the person to have actual physical possession of the firearm[?] Is the mere knowledge that a person is in possession of a firearm a violation of 18 U.S.C. § 924[?]" The district court suggested responding to the question by referring the jurors to the standard "possession" and "aiding and abetting" instructions (which were included in

10

the already-given instructions).  The parties agreed, and that is what the jury was told.

The jury continued their deliberations and subsequently reached a verdict.  Pursuant to

that verdict, Davis was found guilty on all counts, while Coffee was found guilty of

Counts 4 through 8, but not guilty of Counts 2 and 3 (relating to the Levi's store

robbery).

Three weeks after the trial, Davis filed a motion for judgment of acquittal with

respect to Counts 1 through 7, or, alternatively, for a new trial.[7]  The district court

denied the motion, holding that the verdict was supported by the evidence.  At that

point in time, neither Davis nor anyone else had noticed the problem with the verdict

forms.

The United States Probation Office subsequently prepared the defendants'

presentence investigation reports ("PSRs"), and it failed to notice the verdict form

error at that time as well.  Indeed, the PSRs for both defendants represented that they

had been convicted on Count 7 of "Possession and Use of a Firearm During and in

Relation to a Crime of Violence" in violation of 18 U.S.C. § 924(c)(1)(A), and neither

side objected.  In Coffee's PSR, the probation office divided the robbery counts into

four groups.  Group Four, which concerned the Nike robbery, carried the highest

---

[7] Davis did not move with respect to Count 8 (the Nike robbery) as he was caught at the scene.  Indeed, his attorney told the jury during closing argument: "Ladies and gentlemen, I'm not going to stand up here and tell you . . . that he was not guilty of the Nike robbery. . . . He was.  So as to that count, count 8, that's decided.  He was caught redhanded coming out of the Nike, he's running away with the money and a toy gun in his bag."

adjusted offense level (30) and included a five-level increase under USSG §

2B3.1(b)(2)(C) "[s]ince a firearm was brandished or possessed."

Thereafter, at their sentencing hearings, the district court formally adjudged

both defendants guilty of the counts on which they had been convicted, including

"possession and use of a firearm during and in relation to a crime of violence" for

Count 7.  Once again, no one objected.  The district court proceeded to sentence

Coffee to concurrent terms of 150 months imprisonment on Counts 4, 5, 6, and 8,

followed by a statutorily-mandated consecutive term of 84 months on Count 7, for a

total of 234 months.  Davis was sentenced to concurrent terms of 16 months on

Counts 1, 2, 4, 5, 6, and 8, followed by a statutorily-mandated consecutive term of 84

months on Count 3, and a statutorily-mandated consecutive term of 300 months on

Count 7, for a total of 400 months.  Notably, the written judgments mirrored the

verdict forms, which means they correctly reflected that both defendants had been

convicted in Count 7 of violating Section 924(c)(1)(A), but, under the "Nature of

Offense" heading, the judgments erroneously described that count as "Robbery."[8]

Still, no one noticed the error.  On March 3, 2015, the defendants filed this appeal.

Almost two months later, on April 27, 2015, while the defendants' appeal was

pending---and before their briefs were filed---the district court learned of the error on

the verdict forms and in the judgments.  However, it was not the parties who

discovered and advised the district court of the error; rather, it was brought to the

---

[8] Presumably, whoever drafted the written judgments simply looked to the verdict forms for a description of the offenses.

12

district court's attention by the U.S. Probation Office.  The district judge, *sua sponte*, invited the parties to advise if they had any objection to her amending the judgments to correct this clerical or "scrivener's" error.  The defendants both filed objections, arguing that the judgments should not be amended as to Count 7 but, rather, that count should continue to read "robbery, in violation of 18 U.S.C. § 924(c)(1)(A)."  While at first blush it may appear unusual for a party to ask that a clearly incorrect judgment remain uncorrected, there was a reason for this request: The defendants argued in their objections that if the jury had found them guilty of "robbery" in Count 7 as opposed to the Section 924(c) firearm charge (and if their written judgments continued to reflect a "robbery" conviction for that count), then their statutorily-mandated consecutive sentences were "illegal" and should entitle them to a new sentencing.  In a thorough 14-page order, the district court rejected this argument and amended the judgments over their objections.  The defendants now appeal this ruling.[9]

---

[9] The defendants have raised other arguments on appeal as well, but they can be disposed of quickly.  They first argue that the district court erred in denying Davis's motion for judgment of acquittal and/or motion for new trial based on sufficiency of the evidence grounds.  Viewing the evidence in the light most favorable to the government---as we must---we have no difficulty saying that a reasonable jury could have found the defendants guilty and that a new trial is not warranted.  Indeed, the evidence of defendants' guilt was overwhelming.

Their sentencing arguments fare no better.  The defendants contend that their sentences were substantively unreasonable as they received longer sentences than their co-defendants (all of whom pled guilty); Coffee maintains that the district court improperly calculated his advisory guideline range by applying the five-level enhancement for possession of the Taurus pistol in the getaway car during the Nike robbery and for the shotgun that Patterson took out of the trunk, but then put back in, during the course of that crime; and Davis argues that the district court erred in "stacking" his two Section 924 convictions.  These arguments find no support in the law.  The latter argument in particular---as Davis concedes---is foreclosed by binding circuit and Supreme Court precedent.  *See Deal v. United States*, 508 U.S. 129, 131, 113 S. Ct. 1993 (1993); *United States v. Rawlings*, 821 F.2d 1543, 1545 (11th Cir. 1987).

## II.

The first thing we have to do is determine our standard of review. Do we review for plain error, or is our review *de novo*? To answer this question, it is important to make clear exactly *what* the defendants are challenging on appeal.

If the defendants were directly challenging their verdict forms and seeking reversal based on the errors therein, we would review for plain error because they did not object to the verdict forms "before the jury retire[d] to deliberate." Fed. R. Crim. P. 30(d); *see also, e.g., United States v. Mitchell*, 146 F.3d 1338, 1342 (11th Cir. 1998) ("Because [the defendant] did not raise objections to the [verdict form] we review . . . for plain error."). In order to establish plain error, a defendant must show that (1) an error existed, (2) it was plain, (3) the error affected his substantial rights, and (4) it seriously affected the fairness, integrity or public reputation of the judicial proceedings. *See, e.g., United States v. DiFalco*, 837 F.3d 1207, 1220-21 (11th Cir. 2016) (citations omitted). "The plain error test is 'difficult to meet' and places 'a daunting obstacle before the appellant.'" *Id.* at 1221 (citation omitted).[10] Perhaps believing they might not be able to satisfy this difficult-to-meet standard, the defendants do not directly challenge the verdict form error itself. Rather, they have

---

[10] This discussion of the plain error standard assumes, without deciding, that our review of the verdict form error would not be barred entirely by the invited error doctrine given that the defendants jointly submitted the verdict forms. *See, e.g., United States v. James*, 642 F.3d 1333, 1337 (11th Cir. 2011) (concluding that invited error barred review where defendant "submitted the very instruction he now challenges").

focused their attention on the propriety of the district court amending their written judgments pursuant to Rule 36.  A district court's application of Rule 36 is reviewed *de novo*.  *United States v. Portillo*, 363 F.3d 1161, 1164 (11th Cir. 2004).  So, that is the standard of review that we will apply.

III.

"It is clear in this Circuit that Rule 36 may not be used to make a substantive alteration to a criminal sentence."  *Id.* (citation and quotation marks omitted).  Our precedent provides that while Rule 36 may be used to correct a "clerical" error in a written judgment, "correction of the judgment [cannot] prejudice the defendant in any reversible way."  *United States v. Diaz*, 190 F.3d 1247, 1252 (11th Cir. 1999); *see also United States v. Reeves*, 742 F.3d 487, 507 n.12 (11th Cir. 2014).

The defendants argue that the amended judgment did not correct a clerical error, but rather it constituted a substantive alteration that prejudiced them.  They contend that it was a "substantive alteration" as the jury may have been confused and thought they were finding the defendants guilty of "robbery" in Count 7; and, therefore, amending the judgments to reflect a Section 924(c) firearm conviction "prejudiced" them to the extent they were exposed to a minimum mandatory (and consecutive) sentence.  The defendants thus ask that we reverse this case and remand with instructions for the district court to strike the amended judgments and reinstate the original judgments to accurately reflect what the jury found.  We must decline this request.

15

Preliminarily, what the defendants claim the jury found, *i.e.*, "robbery, in violation of 18 U.S.C. § 924(c)(1)(A)," does not exist. There is no such crime in the U.S. Code. It should go without saying that a district court cannot knowingly reinstate a judgment that reflects an offense that does not exist and with which the defendant was never charged. At oral argument, Coffee's attorney was asked a hypothetical that illustrates the problem with the relief that defendants seek. She was asked to assume that in drafting the *original* judgment, the district court only identified Count 7 as a violation of 18 U.S.C. § 924(c)(1)(A), without any further description of the charge. Under those facts, counsel was asked, could defendants have moved the district court to amend the original judgment to include "robbery" before the statutory citation, consistent with how the verdict form read? Counsel acknowledged that they could not have asked the district court to do that---and, furthermore, that the district court would have had no authority and jurisdiction to do it---"because robbery under 924(c) doesn't exist." That is the defendants' dilemma (as counsel recognized during oral argument): if the district court could not have amended the judgment to track the verdict form by *adding* the "robbery" description (because there is no such crime), how could it be error for the district court to amend the judgment to *omit* "robbery" and replace it with the correct charge? On the unique facts of this case, we hold that it was not error.

First, it does not appear that the jurors were confused and thought they were convicting the defendants of "robbery" on Count 7. In the absence of any reason to

16

believe otherwise (and none has been suggested), we presume the jury was paying attention when: (a) the district court read the superseding indictment to the jury pool during *voir dire*, and it correctly sets out that Count 7 was for "using a firearm during and in relation to" robbery of the Sweetbay Market; (b) both the government and defense counsel *repeatedly* told the jury during their opening statements and closing arguments that the six robbery counts were separate and distinct---and required different kinds of proof---from the two firearm counts in Counts 3 and 7 (the former of which *was* correctly described on the verdict form); (c) the jurors were given a copy of the superseding indictment and specifically told (by defense counsel) to be sure and "match . . . up" the two groups of offenses; and (d) the district court gave correct final instructions on the law and told the jurors yet again that the two firearm charges "in counts three and seven" were different than the robbery counts (and each juror received a written copy of the jury instructions).  Moreover, the jury's question during deliberations ("[Does] the offense of using a firearm which would violate 18 U.S.C. § 924 require the person to have actual physical possession of the firearm?") suggests the jurors understood and appreciated the distinction between a Section 924 firearm violation and a Section 1951 robbery charge.  On this record, it is doubtful that the jurors were confused and thought they were convicting the defendants of a "robbery" offense in Count 7.  And if the jurors were not confused, and knew they were finding the defendants guilty of a Section 924(c) charge, amending the written

17

judgments to accurately reflect that offense was not a "substantive alteration" of the jury's verdict.[11]

Second, even if we were to agree with the defendants that the record is at least ambiguous with respect to what the jurors found on Count 7, there was no prejudice on the facts of this case. To sustain a conviction under Section 924(c) for robbery of the Sweetbay Market, the government had to prove that (1) during and in relation to that robbery, the defendants (2) used, carried, or possessed a firearm in furtherance thereof. *See, e.g., United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005). The defendants did not dispute at trial that the government proved its case with respect to that charge *if* the jury found that they were two of the several men behind the masks at

---

[11] It strikes us as more probable that the jury did not even notice that Count 7 had been incorrectly described as "robbery" on the verdict form. We note once again that all of the attorneys, the district judge, her law clerk, and court staff missed it. It seems unlikely that the jury noticed something that the experienced attorneys and court personnel (including the probation office) missed for several months. The jurors perhaps looked at the *number* of the count (but not closely at the *description*) and just assumed that it said "using a firearm during and in relation to a crime of violence," as charged in the superseding indictment, described in the instructions, and as they had been repeatedly told by the lawyers and the judge during the course of trial.

Despite this trial record, however, the defendants maintain that there is evidence of jury confusion. Specifically, they note that the jury's question during deliberations asked about the "offense" of using a firearm in violation of Section 924, rather than using the plural "offenses." They suggest that this shows the jurors were confused and thought there was only *one* Section 924 charge. We suspect the defendants are reading too much into the phrasing of the question. Indeed, the jurors may have begun the question "[does] the offense of using a firearm" because they knew that whatever answer the district court gave would obviously apply to both charged crimes, and, consequently, the alternative "do the offenses of using a firearm" was unnecessary. Regardless, even if we were to agree that the phrasing of the question indicated confusion on the jury's part, as we will discuss next, the defendants would still not be entitled to relief on the facts presented.

18

the Sweetbay Market robbery. Their whole defense was that their co-defendants had falsely accused them to get a reduction in their own sentences.[12]

Even if we assume that the jurors were confused by the error in the verdict form and somehow---and inexplicably---thought Count 7 was a *second* "robbery" charge relating to the Sweetbay Market, by finding the defendants guilty of that count (and of Count 6), *the jury necessarily found that they were part of the group that robbed the store*. And it is undisputed that the perpetrators of that robbery carried and used the shotgun during and in relation thereto. The eyewitness victims testified to that effect, and the store surveillance video confirms it. In fact, Davis's attorney admitted during her closing argument that "for Levi's, Oshkosh, Sweetbay and McDonald's, [the] shotgun was used," and both defendants have conceded in their briefs on appeal that the shotgun was brought into the Sweetbay Market specifically "to scare the store employees" during that robbery.[13] It is thus inarguable that the shotgun was used in furtherance of the Sweetbay Market robbery. *United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002) (concluding that the word "furtherance" in Section 924(c) "should be given its plain meaning," which means the government need only establish that the firearm "helped, furthered, promoted, or advanced" the robbery in some way). It flows therefrom that the jury found the

---

[12] To highlight just one of numerous examples, Coffee's attorney told the jury during closing argument that the cooperating government witnesses each had a strong incentive to lie and, "frankly, . . . it all circles back [to them] and whether or not you're willing to accept what they say[.]"

[13] Davis made this concession in his brief, and Coffee expressly adopted and joined Davis's brief.

19

defendants guilty of the firearm charge in Count 7, even if they were "confused" by the fact that the crime was incorrectly described on the verdict form. Consequently, there was no prejudice in amending the judgments to reflect a violation of Section 924(c). The salient point is the defendants were not exposed to a longer prison term *because of the Rule 36 amendment* but, rather, *because the jury inescapably found that they had used a gun for the Sweetbay Market robbery.*

While we have not been able to locate any Eleventh Circuit case directly on point, the conclusion we reach today is consistent with our prior opinion in *United States v. Diaz*, *supra*, 190 F.3d at 1247. The defendant in that case was charged with conspiracy to distribute cocaine, and the verdict form correctly identified and described that offense. However, the jury was instructed on conspiracy to possess with intent to distribute cocaine and, after he was convicted, his written judgment reflected that erroneous charge. The defendant appealed the judgment, challenging its validity on the ground that the district court had convicted him of a crime that was not charged in the indictment. On review, this Court considered whether the error in the judgment was merely clerical, or whether it was something more. If the error was clerical, the case could be remanded with instructions for the district court to enter an amended judgment under Rule 36. If it was something more, *i.e.*, if it would "prejudice the defendant in any reversible way," then Rule 36 would not apply. *See id.* at 1252. *Diaz* held that the error was clerical and that it was proper to remand the case with instructions for the district court to amend the judgment in accordance with

20

the indictment and the jury's verdict. The panel identified seven reasons for its decision, five of which are directly applicable here.

First, the court "reviewed all the other points of error as to the conviction argued on this appeal and [found] them to be without merit. But for this error the judgment would be affirmed." *Id.* We have likewise considered all of the other arguments that the defendants here have raised and find them to be without merit. *See supra* note 9.

Second, *Diaz* found that "there was no apparent confusion as far as the jury was concerned." 190 F.3d at 1252. This finding was based, in relevant part, on the fact that the jurors had been provided a copy of the indictment, they were "told to follow" it, and the record (the closing arguments in particular) "made quite clear" to the jury what the real charge was. *Id.* That, as previously noted, is exactly the same situation in this case.

Third, *Diaz* said it was significant that "the thrust of the defense in this case was the lack of credibility of the government's witnesses. There was little, if any, suggestion that the evidence they gave did not satisfy the elements of the crime charged." *Id.* That, too, is the same situation presented here. Davis and Coffee based their defense on the argument that the government's cooperating witnesses should not be believed because their testimony was at times inconsistent and they were seeking to curry favor with the government. There was (and is) no argument that the evidence at trial did not otherwise prove the elements of the firearm charge in Count 7.

Fourth, the *Diaz* court observed that "although the jury was not specifically charged on the indictment crime of conspiracy to distribute, there was no objection or request by defense counsel, although objections and requests were specifically invited by the court, so that cannot be claimed as error on this appeal." *Id.* at 1252-53. Of course, that circumstance is also present here since the defendants not only said that they had "no objection" to the verdict forms when asked, but they actually submitted them.

Fifth, and importantly, the *Diaz* court stated:

> [I]f the testimony of the government's witnesses is true, the evidence overwhelmingly proves that the defendant was guilty of [the charged offense of] conspiracy to distribute cocaine. Whether that testimony was true was squarely put to the jury by both the instructions of the court and the argument of both counsel. It was the jury's job to determine who was telling the truth, and who was not.

*Id.* at 1253. Again, that is the same situation in this case. There was (and can be) no argument that if the jurors believed that the cooperating co-defendants told the truth to the extent they testified that Davis and Coffee participated in the Sweetbay Market robbery (and, with their verdict, they obviously *did* believe that testimony), then the evidence overwhelming and irrefutably establishes that the defendants were guilty of the firearm offense charged in Count 7.

For its sixth and seventh reasons, *Diaz* noted that both of the crimes at issue there (conspiracy to distribute cocaine and conspiracy to possess with the intent to distribute cocaine) were charged as conspiracies under the same statute and with the

22

same underlying substantive offense statute, and they thus implicated the same sentencing guidelines; consequently, the difference between the two offenses, from a practical standpoint, was "a distinction without a difference." *See id*. Seizing on this portion of the *Diaz* opinion, Coffee argues in his reply brief that prejudice can be inferred (and, therefore, the error was not merely clerical) because robbery and using a firearm during and in relation to a crime of violence are controlled by different statutes and are not subject to the same sentencing guidelines.[14] And, further, robbery and using a firearm during and in relation to a crime of violence require proof of different and separate elements and do not have a single common element, like the conspiracy crimes in *Diaz*. This is all true, but it does not help the defendants. While this prejudice argument could have merit if it was *possible* that defendants *might* have been acquitted on Count 7 if it were not for the error in the verdict form, the verdict that the jury rendered on Count 6 and Count 7 makes clear that would not have happened. The final two *Diaz* "reasons" are simply not applicable here.

Ultimately, if it was proper to use Rule 36 to amend the judgment in *Diaz*, where the erroneous judgment arose out of an erroneous jury instruction that was given to the jury, it was proper to use the rule here, where the erroneous judgment arose out of an erroneous verdict form that (a) was not objected to, (b) did not in any way confuse the jury, or, even if it did, (c) could not have possibly prejudiced the defendants. Consistent with our analysis in *Diaz*, we conclude that the verdict form

---

[14] In fact, once again, the offense of using a firearm during and in relation to a crime of violence subjects a defendant to a minimum mandatory (and consecutive) sentence.

23

error was harmless on the facts of this case, and amending the judgments that were based on those verdict forms is the sort of clerical correction contemplated by Rule 36.[15]

IV.

For all these reasons, the judgment of the district court is **AFFIRMED.**

---

[15] The district court recognized that many cases involving Rule 36 amendments involve correcting a *statutory citation*, as opposed to correcting how a crime was *named* or *listed* on the verdict form.  However, the district court believed this was "a distinction without a difference" because "Defendants do not identify, and the Court could not locate, a case specifically holding that the correction of a clerical error is limited to the correction of the statute of conviction in a judgment."  Incidentally, we note that the Third Circuit confronted this same factual situation in *Government of Virgin Islands v. Bedford*, 671 F.2d 758 (3d Cir. 1982), and it said that Rule 36 *can* be utilized to correct such "clerical errors."  The defendant there was charged by information with unlawful possession *of an unlicensed firearm* during the commission of a crime of violence, but the verdict form mistakenly described the crime as possession *of a dangerous weapon* during the commission of a crime of violence, which was a separate statutory offense.  No one noticed the error before or after the verdict was read in open court.  On appeal, the defendant argued for reversal because, *inter alia*, he "was never charged with the offense he was convicted of" and the verdict was "fatally flawed and at variance with the charge" set out in the information.  *See id.* at 762-63.  The Court of Appeals wasted little time with this argument as it held that "the error in the verdict form was merely clerical."  *See id.* at 763.  After observing that "it was apparent from the information, the Government's evidence at trial, and the court's instruction that [the charge] involved possession of a firearm," our sister circuit said: "It is clear to us that what occurred was a clerical mistake, which could have been corrected at any time by the district court under Fed. R. Crim. P. 36."  *See id.* at 763-64; *cf. Pacheco v. Dugger*, 850 F.2d 1493, 1495 (11th Cir. 1988) (holding in Section 2254 habeas case that appellate counsel was not ineffective for failing to seek reversal based on the fact that the verdict form listed a different crime (sexual battery with great force) than the one charged in the indictment (sexual battery involving the use or threatened use of a deadly weapon); concluding "the slight discrepancy in the title which was used to describe the crime was insignificant" and "immaterial" since the jury was given a "complete" instruction for the offense charged in the indictment).